Matter of S———K———C———

In DEPORTATION Proceedings

A-3656158

*Decided by Board November 14, 1958*

**Good moral character—Suspension of deportation—Employment as dealer in gambling house during part of statutory period bars alien from establishing good moral character (section 101(f)(4)).**

Applicant for suspension of deportation who received salary for six months as dealer or operator of gaming table is held to have derived income from gambling activities within meaning of section 101(f)(4) of the 1952 act and by reason of such employment within statutory period to be barred from establishing good moral character.

CHARGE:

Order: Act of 1952—Section 241(a)(11), as amended July 18, 1956 (8 U.S.C. 1251(a)(11), 1952 ed., Supp. V)—Convicted of violation of law relating to illicit possession of narcotic drugs.

**BEFORE THE BOARD**

**Discussion:** This case is before us on appeal from a decision of a special inquiry officer denying the respondent's application for suspension of deportation and directing that he be deported.

The respondent is a 62-year-old married male, native and citizen of China, who last entered the United States on November 1, 1932, as a returning resident. He has resided in the United States since July 1911 but had been absent on 3 occasions prior to November 1, 1932. On March 11, 1938, he was convicted of possession of narcotic drugs in violation of a statutory provision of the State of Washington, and he served 2 years of a 3 to 10 years' sentence.

The respondent has conceded his deportability, and the only issue involved is whether the application for suspension of deportation should be granted or denied. For the reasons hereinafter stated, we hold that he has not established statutory eligibility for suspension of deportation, and we do not reach the question of whether, in the exercise of discretion, a grant or denial of suspension would have been appropriate.

It is contended by counsel that deportation for a crime committed 20 years ago is too extreme a penalty to impose on a man who has

185

reformed. The charge of deportability stems from 8 U.S.C. 1251 (a)(11) as amended by the Act of July 18, 1956 (70 Stat. 567), and apparently the respondent would not have been deportable prior to that amendment. However, the retroactive nature of the legislation is not a bar to deportation (*Mulcahey* v. *Catalanotte*, 353 U.S. 692 (1957); *Matter of M——V——*, 7 I. & N. Dec. 571 (1957)). Hence, regardless of all other factors, 8 U.S.C. 1251(a)(11) requires the respondent's deportation unless he can establish his eligibility for suspension of deportation or some other statutory relief.

8 U.S.C. 1254(a)(5) sets forth the statutory requirements for suspension of deportation which are applicable to the respondent's case, including one that he must establish his good moral character for 10 years preceding the filing of the application (*Matter of M——*, 5 I. & N. Dec. 261, 268 (1953)). The respondent having filed his application for suspension on December 12, 1957, must prove good moral character since December 12, 1947. The special inquiry officer held that the respondent was precluded from doing so by reason of the provision contained in 8 U.S.C. 1101(f)(4) and the fact that he had been employed as a dealer in the gambling games of Chinese dominoes and fan-tan at the Bataan Recreation Club, Seattle, Washington, from about October 1956 until about April 1957 at a salary of $35 weekly.

The pertinent part of 8 U.S.C. 1101 is as follows: "(f) For the purposes of this chapter—No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—* * * (4) one whose income is derived principally from illegal gambling activities * * *." Hence, the question resolves itself into whether this statutory provision bars the respondent from establishing good moral character because of his employment as a dealer from October 1956 to April 1957.

Mr. D——S——, operator of the Bataan Recreation Club, was questioned by an investigator of the Service. He indicated that players of Chinese dominoes in his establishment could not bet more than $1.00 at a time; that a player could win or lose $50 to $100 during a night; and that the "house" collected 10 percent of the winnings.

The respondent testified that he had never acted as a dealer except at the Bataan Recreation Club and that he took the job there because he was unable to find any other employment at the time. When he was asked whether the fan-tan games in which he was a dealer were gambling games, he said that there were chips on the table but that he did not see any money changing hands. He admitted that he had control of the games in which he was

dealing to the extent that he gave the winners more chips and that he took the chips away from the losers. He stated that he placed the chips of the losers in a chip receiver and that these chips belonged to Mr. S——.

The respondent also claimed that he did not know how the players obtained the chips; that he had no idea whether the players brought their own chips; and that he does not know whether there was a cashier at the club from whom the players might have obtained their chips. When he was asked whether he observed any gambling while employed at the Bataan Recreation Club, he answered, "I don't remember, I did not see any." When asked whether the people playing fan-tan or dominoes won or lost any money, his answer was that he saw them win chips and lose chips.

Counsel argues that if money changed hands, it was handled by the proprietor (S——) "as the investigative report reveals." S—— was familiar with the amount that could be won or lost in his club during the course of a night, but there is nothing to indicate that he handled the money. Although counsel does not make the assertion in his brief, it seems clear from the respondent's testimony that he is claiming that he did not know that money was being wagered in the games in which he was a dealer. He was a mature person, he was being paid solely for his work as a dealer, and he was employed in this gambling house for 6 months. Under these circumstances, his claim is too preposterous to believe, and we find, as a fact, that he was fully aware that money was being wagered on these games.

It is contended by counsel that the respondent was a mere employee at the Bataan Recreation Club and cannot be said to have been glambling if he did not handle the money nor receive any of the winnings. No authority is cited for the contention. We hold that the reference in 8 U.S.C. 1101(f)(4) to income from illegal gambling activities includes income from (1) an alien's financial interest in a gambling establishment, (2) the gambling activities of the alien himself, and (3) an alien's employment in a gambling establishment where the employment has some proximate relationship to the gambling activities, such as a dealer or operator of a gaming table. Hence, we conclude that the salary received by the respondent as a dealer in the Bataan Recreation Club was income derived from gambling activities.

Counsel has referred to the fact that Mr. S—— had a city license to conduct a card room and that there was nothing to indicate any arrests for gambling had been made in his establishment. The investigating officer stated that in all probability the games played at the Bataan Recreation Club were illegal under the Washington Statute but are tolerated and licensed by the City of Seattle.

187

The special inquiry officer cited section 9.47.0110 of the Revised Code of Washington which prescribed a term of imprisonment up to 5 years in the case of a person who operates, as the owner, *dealer*, *etc.*, any gambling game or game of chance. Counsel does not urge that gambling may be conducted lawfully in the State of Washington, and we hold that the gambling activities under discussion here were illegal.

As appears from the foregoing, the respondent's income was derived from illegal gambling activities during the period from October 1956 until April 1957. In connection with the further question of whether his income was derived *principally* from that source, we have indicated that the respondent testified that he took the job in the Bataan Recreation Club because he was unable to find any other employment at the time. There is nothing in the record indicating that he had any source of income from October 1956 to April 1957 other than his salary of $35 weekly from the Bataan Recreation Club. Hence, not only was his income derived principally from illegal gambling activities, but it appears that his income was derived solely from such activities.

We have considered one additional point although it was not specifically raised by counsel. This relates to the connotation to be given to the word "principally" in 8 U.S.C. 1101(f)(4). In other words, does it mean a case in which, considering the 10-year-period as a whole, the income was derived principally from illegal gambling activities? If that had been the intention of Congress, the result could have been achieved by inserting the words "during such period" as was done in paragraphs (2), (3), (5) and (7) of 8 U.S.C. 1101(f). The fact that it does not appear in paragraph (4), which is here involved, is abundant reason for refusing to interpret that paragraph as though it read, "one whose income during the 10-year-period is derived principally from illegal gambling activities."

The interpretation suggested in the preceding paragraph would lead to absurd results. In the respondent's case, although *all* of his income during a period of 6 months was derived from illegal gambling activities, it would represent only one-twentieth of his income during the 10-year-period, and in those cases in which 10 years of good moral character must be established, it would apparently be necessary for the alien to have derived his income principally from illegal gambling activities for approximately 5 years before the bar of this provision would come into effect.

In cases under 8 U.S.C. 1101(f)(4), the suggested construction would result in reducing by approximately one-half the period of good moral character which such aliens would be required to establish. That such a construction was not intended by Congress is

amply demonstrated by other paragraphs of 8 U.S.C. 1101(f). For example, paragraph (2) bars an alien from establishing good moral character if he committed a single act of adultery at any time during the required period of good moral character (5, 7 or 10 years), paragraph (5) precludes establishment of good moral character where the alien has been convicted of two gambling offenses at any time during the entire period even though the convictions may have been for minor gambling infractions, and paragraph (6) bars an alien who, in order to obtain benefits under the act, gave false testimony on any occasion during the entire period.

As we have indicated above, 8 U.S.C. 1101(f) commences with the statement that no person shall be regarded as a person of good moral character "who, *during the period* for which good moral character is required to be established, *is, or was—*" which is followed by paragraphs (1) to (8), inclusive. 8 U.S.C. 1254(a)(5), under which the respondent's application for suspension of deportation was filed, contains the requirement that the alien prove "that during *all of such period* he has been and is a person of good moral character." In view of the language we have emphasized, we believe that the specific terms of the statute preclude a finding of good moral character in the case of any alien who has committed the forbidden acts or in whose case the proscribed condition existed at any time during the required period of 5, 7 or 10 years. For that reason and on the basis of our finding above that the respondent's income for a period of approximately 6 months was derived principally from illegal gambling activities, we hold that 8 U.S.C. 1101(f)(4) precludes a finding of good moral character in the respondent's case. Hence, he has not proved that "during *all of such period*" (10 years) he has been a person of good moral character as required by 8 U.S.C. 1254(a)(5), and the appeal will be dismissed.

**Order:** It is ordered that the appeal be and the same is hereby dismissed.